UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| ACKERMANN ENTERPRISES, INC., et al., | ) ) ) | |
| | ) | Civil No. 14-207-ART |
| Plaintiffs, | ) ) | |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| CITY OF BELLEVUE, KENTUCKY, et al., | ) ) ) | |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Even the best-laid plans can go awry.  When they do, the planners often end up in court.  Ackermann Enterprises and the City of Bellevue, Kentucky, planned to develop a luxury riverfront property.  When that plan went awry, each party blamed the other.  Continuing the finger-pointing in this Court, both sides now move for summary judgment.

## I.  Background

Bellevue is a small Kentucky city, overlooking the Ohio River.  Many years ago, the City decided to transform its riverfront property into an urban, mixed-use area.  R. 1-2 (Bellevue Urban Renewal Plan).  To do this, the City used private developers.  Ackermann Enterprises was one of those developers.

### A.  The Agreements

Ackermann and the City initially agreed on a Site Plan for the development, now called "Harbor Greene."  R. 69-6 (Site Plan).  The plan changed a few times, but the most recent version envisioned commercial and retail buildings, as well as three residential buildings with

thirty-eight condominium units each.   R. 69-7 (2003 Site Plan Revisions); R. 70 at 43 (Deposition of Dobbs Ackermann).   To turn that plan into a reality, Ackermann, the City, and the Bellevue Urban Renewal and Community Development Agency entered into two agreements: the "Development Agreement," R. 1-3, and, two years later, the "Service Agreement," R. 1-5.  Under those agreements, the parties agreed to five terms that are relevant, and undisputed, here.

First, Ackermann agreed to develop the Harbor Greene project "consistent with the Site Plan."  R. 1-3 § 4(a) (Development Agreement).  Although the Site Plan is attached to the agreement, Ackermann could propose changes to it.  *Id.*  It could only implement those changes, however, if the City, the Agency, and the Bellevue Planning Commission all reviewed and consented to the proposal.  *Id.*  And all three entities agreed not to "unreasonably withh[o]ld" their consent.  *Id.*

Second, the City needed to provide property for Ackermann to develop.  At the time of the agreement, the City already owned some property, but it needed to acquire more.  So the City agreed to acquire property through eminent domain.  *Id.* § 3(b).  Ackermann would then reimburse the City for its costs, and the City would then sell the property to Ackermann.  *Id.* § 5.

Third, to fund the Harbor Greene project, the City took out bonds and collected real estate taxes on the property.  But the taxes did not fully cover the cost of the bond obligations.  So Ackermann agreed to make regular payments to the City to cover the difference, which the parties called "PILOT payments."  R. 1-5 § 3 (Service Agreement).

Fourth, the parties agreed that Ackermann might need to work with other companies to complete the Harbor Greene project.  Thus, Ackermann was allowed to assign part of the

Development Agreement to its helpers.  R. 1-3 § 4(g).  But Ackermann was required to get the City's consent before doing so.  *Id.* § 19.

Finally, the parties agreed to deal with any potential disputes through alternative dispute resolution.  The parties would first submit their claims to mediation.  *Id.* § 18(f).  If that failed, the parties would then move to binding arbitration.  *Id.* § 18(g).

### B. The Proposed Changes

After signing the Development Agreement, Ackermann got to work on the Harbor Greene development.  Ackermann completed the commercial properties first.  R. 70 at 26 (Deposition of Dobbs Ackermann).  Then it began building the residential properties.  *Id.*  But Ackermann only built one of the three planned condo buildings.  *Id.* at 27.

Instead of building the last two, Ackermann wanted to amend the Site Plan.  So in 2011, Ackermann took a proposal to the Bellevue Planning Commission—the "First Application"— as the Development Agreement required.  R. 1-17 (First Application).  In that application, Ackermann asked to build a single residential building with 216 apartments, instead of the original two buildings with 76 condos between them.  *Id.* at 2.

The Planning Commission held a public meeting to discuss the application, solicited public comments, and reviewed all of the relevant information and concerns.  *See* R. 1-10 (Planning Commission Minutes on January 5, 2012).  Ultimately, the Commission denied the application, citing concerns about density, traffic flow, insufficient public space, and integration into the community's character.  *Id.*  Facing defeat, Ackermann sought mediation with the City.  *See* R. 70 at 102 (Deposition of Dobbs Ackermann).  The parties discussed potential modifications, but could not reach a resolution.  *Id.*

Two years later, Ackermann brought another proposal to change the Site Plan—the

3

"Second Application." R. 1-18 (Second Application). In that application, Ackermann still proposed to build apartments instead of condos. But under this new plan, Ackermann would only build 180 apartments. *Id.* at 2.

The Commission again convened to review Ackermann's proposal—hosting a public hearing, taking public comment, and voting on the proposal. *See* R. 69-16 (Planning Commission Minutes on May 8, 2014). The Commission then denied the Second Application. *Id.* at 4. This time, the Commission provided several findings supporting its decision: the density exceeded the zoning limitations, there was no retail or commercial aspect, the plan did not promote mixed use, the number of residential units was unreasonable, and the street configuration violated zoning laws. *Id.* The Commission also found that there was no evidence supporting Ackermann's claim that the condo market was in decline. *Id.* Ackermann then asked the Bellevue City Council to review the Second Application. R. 1-11 (City Council Minutes on July 17, 2014). The Council agreed to do so, but ultimately adopted the Planning Commission's findings and denied the application. R. 1-12 (City Council Minutes on August 13, 2014).

### C.  The Legal Claims

Following the City's denial of the Second Application, the parties next met in court. Ackermann, along with the subsidiaries it created to build the Harbor Greene development, sued the City and the Community Development Agency in this Court alleging breach of contract, unlawful taking, and due-process violations. R. 1. The City sued Ackermann and its subsidiary Harbor Greene Residential ("HGR") in state court, alleging breach of contract and seeking foreclosure on the Development Agreement. *See City of Bellevue, Kentucky v. Ackermann Enterprises, Inc., et al.*, No. 2:15-cv-00081-ART, D.E. 1-3 (E.D. Ky. May 20,

2015).  Ackermann removed that case to federal court, and the Court consolidated the two cases.  R. 32.

To summarize the claims:  The City argues that Ackermann breached the contract by failing to complete the Harbor Greene project, to make required payments, and to get consent before assigning the Development Agreement to another company.  Ackermann, on the other hand, argues that the City breached the contract first by denying the First and Second Applications.  Further, Ackermann says that the City's denial constitutes an unlawful taking, violating both the Kentucky Constitution and the United States Constitution.  Now that all of those claims are before this Court, every party moves for summary judgment:

- The City, the Agency, and HGR move for summary judgment on the grounds that they are not proper parties to this case.  R. 69; R. 76.

- The City and Ackermann both move for summary judgment on the City's contract claims.  R. 69; R. 76; R. 93.

- Ackermann and the City both move for summary judgment on Ackermann's contract claims, federal constitutional claims, and state takings claim.  R. 69; R. 76.

## II. Discussion

### A.  Proper Parties

Before discussing the parties' many substantive claims, the Court must address a threshold question:  Are the correct parties present?  The City, the Agency, and HGR all move for summary judgment on the grounds that they are not a proper party.  The Court must grant their motions if there is no "genuine dispute as to any material fact" regarding the parties'

5

improper presence in this case.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### i. The City is properly named in this suit.

The City moves for summary judgment on all of Ackermann's claims because, the City alleges, Ackermann sued the wrong party.  R. 69 at 14.  In the City's view, Ackermann's claims all stem from the fact that the Planning Commission rejected the First and Second Applications.  *Id.*  So Ackermann should have sued the precise entity that caused the harm— the Planning Commission, not the City.

As a basis for this argument, the City cites Kentucky law.  *Id.* at 14–16.  Under that law, a party injured by a final action of the Planning Commission may appeal to the state circuit court.  Ky. Rev. Stat. § 100.347(2) ("KRS").  And that appeal must strictly comply with the procedural requirements for review.  *See Bd. of Adjustments v. Flood*, 581 S.W.2d 1, 2 (Ky. 1978).  When a party fails to comply it has "not lawfully invoked" the "judicial power."  *Id.* In other words, if the party did not correctly appeal its claims, the state court cannot hear them.

The City argues that—by neglecting to sue the Planning Commission—Ackermann did not satisfy one of the requirements of KRS § 100.347(2): to sue the Planning Commission. Thus, the argument goes, this Court cannot hear Ackermann's claims.  But that argument contradicts the plain language of the statute.  By its own terms, the statute applies only when the wronged party asks the court to review the substance of the Planning Commission's decision.  *See Greater Cincinnati Marine Serv., Inc. v. City of Ludlow*, 602 S.W.2d 427, 428– 49 (Ky. 1980).  When, however, the wronged party seeks anything else, the party is not bound by the statute and may sue the City.  *See id.* (allowing a party to sue the City when the party alleged that the Planning Commission violated the Constitution).  Such is the case here.

6

Ackermann argues that the City breached their contract and violated the state and federal constitutions. The fact that resolving those claims might involve some analysis of the Planning Commission's decision does not bring Ackermann's claims within the narrow confines of KRS § 100.347(2). So that argument fails.

The City also glosses over an important fact that makes it a proper party to this case: The City signed the Development Agreement. *See* R. 1-3 at 19. That agreement, Ackermann argues, required the City to consent to reasonable proposals amending the Site Plan. Yet the City denied Ackermann's application. *See* R. 1-12 at 4 (City Council Minutes on August 13, 2014). Thus, the City took an independent action that allegedly breached the Development Agreement and allegedly violated Ackermann's constitutional rights.

Further, the actions of the Planning Commission are also fairly imputed to the City. The Kentucky courts have said that a planning commission is a "subsidiary" of the city. *See Bd. of Comm'rs v. Davis*, 238 S.W.3d 132, 135 (Ky. Ct. App. 2007). Thus, Ackermann can hold the City liable for the Commission's actions. The Court must therefore deny the City's motion on the proper-parties issue.

### ii. Ackermann's contract claims against the City are barred by sovereign immunity.

Although Ackermann can sue the City instead of the Planning Commission, the City may assert an immunity defense. It has done so here: The City says it is immune from Ackermann's breach-of-contract claims.[1] R. 69 at 22–24. Under Kentucky law, the City is

---

[1] The City has raised sovereign immunity only as a defense to Ackermann's breach-of-contract claims. R. 69 at 20–22. Although sovereign immunity is often a threshold issue, the Sixth Circuit has made clear that the choice is actually up to the *sovereign* to tell the Court when and where to address the issue. *See Nair v. Oakland Cty. Cmty. Mental Health Auth.*, 443 F.3d 469, 476 (6th Cir. 2006) (noting that the sovereign is "free to express whatever preference it wishes about whether the defense is a threshold issue or one that arises only if the sovereign would otherwise lose on

7

immune from liability for any "injuries or losses" resulting from "the exercise of judicial, quasi-judicial, legislative, or quasi-legislative authority[.]" KRS § 65.2003(3). That authority includes "[t]he issuance, denial, suspension, revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization." *Id.* § 65.2003(3)(c).

Here, the City properly invokes immunity against Ackermann's breach-of-contract claims. According to Ackermann, the City breached the Development Agreement when it "unreasonably withheld consent" to Ackermann's First and Second Applications. R. 76 at 26. The City's decision fits squarely within the language of the immunity statute: It "refus[ed] to issue . . . approval" of the proposed changes. KRS § 65.2003(3)(c). To reach that decision, the City held hearings, solicited public comment, and ultimately decided to reject the two applications. The City's entire process, therefore, was conducted under its quasi-judicial, quasi-legislative authority. And so, it would seem that the City can properly assert an immunity defense to Ackermann's breach-of-contract claims.

Ackermann disagrees. It argues that Kentucky case law prohibits the City from asserting immunity in a breach-of-contract case. R. 83 at 19–20 (discussing *Madden v. City of Louisville*, No. 2003-CA-001162-MR, 2004 WL 1588279, at *5 (Ky. Ct. App. July 16, 2004)). True, in *Madden*, the court held that the city could not assert immunity against a breach-of-contract claim. *See* 2004 WL 1588279, at *5. But there, the plaintiff argued that the city breached by failing to fix a park drain, which, the court explained, was a "purely

---

the merits"). Thus, the Court will only address the sovereign-immunity defense where the City has raised it—and here that is only against Ackermann's breach-of-contract claims.

ministerial dut[y]"—not an exercise of quasi-legislative or quasi-judicial authority. *Id.* Thus, immunity did not apply. By contrast, Ackermann argues that the City breached a contractual duty to exercise its quasi-legislative, quasi-judicial authority and to reach a certain outcome. So *Madden* does not control. Indeed, Kentucky courts have found cities immune in breach-of-contract suits, as long as the city has not expressly waived immunity. *See, e.g.*, *Ammerman v. Bd. of Educ.*, 30 S.W.3d 793, 797 (Ky. 2000). The City has made no such waiver here. Thus, the Court must grant the City's motion as to its immunity from Ackermann's breach-of-contract claims.

### iii. The Agency is entitled to summary judgment because Ackermann alleges no viable claims against the Agency.

The Agency also moves for summary judgment on all of Ackermann's claims. R. 69 at 18. Like the City, the Agency signed the Development Agreement. *See* R. 1-3 at 19. The Agency therefore promised not to "unreasonably withh[o]ld" its consent to proposed changes. *Id.* § 4(a).

Unlike the City, however, the Agency never affirmatively denied Ackermann's First or Second Application. Ackermann merely says that it "requested [Agency] review." R. 70 at 99 (Deposition of Dobbs Ackermann). After the Agency proved "[n]onresponsive," Ackermann neither made a "formal written request" nor otherwise followed up with the Agency to seek its approval. *Id.* at 99–100. Further, Ackermann presents no evidence that it actually submitted either of the applications to the Agency. Ackermann does not even say how it contacted the Agency: Did it call? Did it send an email? If Ackermann did reach out to the Agency and request review, and the Agency turned a cold shoulder, then maybe the Agency did unreasonably withhold consent. But Ackermann does not provide any specific evidence

9

that it made such a request.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

And on summary judgment, it is not the Court's job to speculate about whether that evidence

exists.  *See id*.  The Court therefore must grant the Agency's motion for summary judgment

on all of Ackermann's claims against it.

> **iv. HGR is entitled to summary judgment because it is not a party to the agreement.**

HGR moves for summary judgment on the City's breach-of-contract claims against it.

As grounds, HGR says that it is not a party to the Development Agreement, and, therefore,

could not have breached it.  R. 76 at 38.  Indeed, HGR is not named in the agreement.  *See*

R. 1-3.

The City does not respond to this argument in its briefs.  And what a party does not

argue is deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997)

("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived." (citation omitted)).  Thus, the City has waived any

argument against HGR's motion, and the Court must grant HGR summary judgment on the

City's claims against it.

> **B.  The City Is Entitled to Summary Judgment on Ackermann's Substantive Due Process Claim**

Ackermann argues that the City's denial of its proposed changes to the Site Plan was

"arbitrary and capricious" and thus deprived Ackermann of its property without due process.

R. 1 ¶¶ 57–62.  But "the concept of substantive due process has no place when a provision of

the Constitution directly addresses the type of illegal governmental conduct" that the plaintiff

alleges.  *Montgomery v. Carter Cty.*, 226 F.3d 758, 769 (6th Cir. 2000); *see also  Smith v.*

*Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 217 (6th Cir. 2011) (en banc).  Here,

Ackermann itself points to just such a provision: the Takings Clause. And as long as it seeks the same remedy under both clauses, Ackermann's "due process claim is subsumed by [its] takings claim." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573–74 (6th Cir. 2008).

Ackermann alleges that the City took its property without compensation, violating the Takings Clause. R. 1 ¶¶ 53–56. The remedy it seeks is money. *Id*. ¶ A. Ackermann also alleges that the same act—taking property without compensation—violated its rights under the Due Process Clause. *Id*. ¶ 61. The remedy it seeks is, also, money. *Id*. ¶ A. Thus, the due-process claim is "ancillary" to the takings claim: If Ackermann suffered an unconstitutional taking, then it is entitled to the money it seeks; and if it did not, then it is not. *See Braun*, 519 F.3d at 574. To the extent that Ackermann also seeks a declaratory judgment that the City "unlawfully depriv[ed]" it of its constitutional rights, *see* R. 1 ¶ C, the Takings Clause "directly addresses" that claim, too, *see Smith*, 641 F.3d at 217. If Ackermann suffered an unconstitutional taking, then it is entitled to the judgment it seeks; and again, if it did not, then it is not. Because Ackermann's takings claim "subsume[s]" its due-process claim, the due-process claim cannot survive. *Braun*, 519 F.3d at 574. The City is therefore entitled to summary judgment on Ackermann's substantive-due-process claim.

## C. Ackermann's Federal Takings Claim Is Not Ripe for Review

Ackermann next argues that the denial of its proposed changes to the Site Plan was an unconstitutional taking. R. 1 ¶¶ 53–56. Although the City has not physically taken any of Ackermann's property away, it does not take a forklift to violate the Takings Clause. When a local regulation "goes too far"—like a restrictive zoning decision that prevents putting a piece of land to any good use—"it will be recognized as a taking." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393,

415 (1922).  But the Fifth Amendment does not prohibit the government from taking property, whether by forklift or by zoning ordinance.  What it does is prohibit the government from taking property "without just compensation."  *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985).  Ackermann argues the City has done just that.

Such regulatory-takings claims, however, are subject to a uniquely strict ripeness rule. In general, the ripeness doctrine requires that a plaintiff suffer an actual injury before coming to court.  Were a court to hear a case based on an injury that has not occurred—and might never occur—the court would simply be "entangling [itself] in abstract disagreements over administrative policies" and interfering in an agency's process.  *Abbot Labs. v. Gardner*, 387 U.S. 136, 148 (1967).  Although that danger is ever-present, it is particularly present when the agency in question is a local land-use board, which exercises a "high degree of discretion" in adjusting how the local rules apply to a given plot of land.  *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 738 (1997).  Unless it is clear that the board has made a decision by the time a landowner complains about the decision, the court cannot decide the case.  In other words, "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."  *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 348 (1986) (quoting *Mahon*, 260 U.S. at 415).  By the same logic, a court cannot determine whether such a regulation has injured a landowner unless it knows that the landowner has been injured, *i.e.*, suffered a taking without just compensation.

A regulatory-takings claim is therefore unripe until two things happen.  First, the local land-use board must reach a final decision about how the local rules apply to a given plot of land.  *Williamson Cty.*, 473 U.S. at 186.  Courts have called this the "finality requirement."

12

*Braun*, 519 F.3d at 569.  Second, the landowner who feels injured by that decision must "seek compensation through the procedures the [s]tate has provided for doing so." *Williamson Cty.*, 473 U.S. at 194.  Courts know this one as the "remedies requirement." *Braun*, 519 U.S. at 569.  Putting the two together:  A landowner may not bring a regulatory-takings claim to federal court until his local government has taken his land and denied him just compensation for it.

As to the finality requirement, the Court unfortunately cannot say anything more conclusive than this:  It is unclear whether the City has reached a final decision about Ackermann's property.  On the one hand, the Kentucky courts have said that a Planning Commission vote is a "final action." *Triad Dev./Alta Glyne, Inc. v. Gellhaus*, 150 S.W.3d 43, 46 (Ky. 2004).  And if nothing else, the parties agree that the Planning Commission has voted on Ackermann's proposals.  R. 76 at 16, 20; R. 93-1 at 18, 20.  Thus, it would appear that "the government entity charged with implementing the [relevant] regulations has reached a final decision," as *Williamson* requires.  473 U.S. at 186.

On the other hand, Kentucky law gives Ackermann the chance to appeal the Planning Commission's action to state court. *See* KRS § 100.347(2).  And the Kentucky courts appear to treat such appeals as administrative remedies. *See Commonwealth v. DLX, Inc.*, 42 S.W.3d 624, 626–27 (Ky. 2001) [hereinafter *DLX I*].  Under *Williamson*, a landowner must exhaust such remedies before his federal takings claim can become ripe. *See* 473 U.S. at 192–93.  But whether or not Ackermann appeals, "the government entity charged with implementing the [relevant] regulations"—also known as the Planning Commission—has nevertheless "reached a final decision." *Id*. at 186.  And Ackermann has no further appeal to bring to *that* entity to make it change its mind.  As far as the Court can tell, the Kentucky courts have not yet

13

answered this seeming conundrum:  Namely, is a planning commission's "final action" final enough to satisfy *Williamson*'s first requirement, regardless of the chance to appeal?  As such, this Court cannot say whether the Planning Commission's decision was indeed "final," in the ripeness sense of the word.

Moreover, Ackermann might have had other remedies—short of appeal—that it could have pursued.  Finality "is a factual determination, taking into account all relevant statutes, ordinances, and regulations."  *DLX, Inc. v. Kentucky*, 381 F.3d 511, 525 (6th Cir. 2004) [hereinafter *DLX II*].  Here, the relevant statutes are KRS § 100.241, which empowers the Planning Commission to grant landowners (like Ackermann) variances to the local zoning rules, and KRS § 100.243 and § 100.247, which explain the conditions of granting such a variance.  Among other reasons, the Planning Commission denied Ackermann's proposal because the proposal lacked certain details and failed to comply with various zoning rules.  R. 69-16 at 4.  It would seem, then, that Ackermann could have submitted another proposal that included those details and complied with the rules.  If necessary, Ackerman could have sought variances pursuant to § 100.241, § 100.243, and § 100.247.  Who knows—the Planning Commission might have been amenable to such a proposal.  But since Ackermann did not bring any, the Court cannot know.  When left with such "doubt whether a more modest submission or an application for a variance would be accepted," a court cannot consider a takings claim ripe for review.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001).

Granted, there is no magic number of proposals that a landowner must bring before satisfying the finality requirement.  Nor must a landowner keep bringing hopeless proposals simply to ripen his takings claim.  *See id.* at 621.  But the Supreme Court has spoken with a few different voices about how much a landowner must pester his local land-use board before

14

coming to federal court.  *Compare Macdonald*, 477 U.S. at 353 n.9 (calling a proposal to subdivide a plot into 159 residential lots "exceedingly grandiose," and hence leaving open the possibility that the local board would grant a "less ambitious" plan), *with Palazzolo*, 533 U.S. at 619–21 (holding that "[f]urther permit applications were not necessary" after the local board rejected a proposal to fill eleven wetland acres, even though a smaller proposal "perhaps . . . would have been approved").  Maybe these mixed messages are just the natural result of a "factual determination."  *DLX II*, 381 F.3d at 525.  But without clearer guidance from the cases—and greater expertise in the world of Bellevue zoning—it is difficult to say whether the Planning Commission's decision was final, or whether Ackermann still had remedies to pursue.

The Court need not rack its brain further over the first *Williamson* prong, however, because Ackermann's claim is unripe under the second.  To satisfy the remedies requirement, a landowner must show that he sought compensation and was denied, or that his state offered no compensation for him to seek.  *See Williamson*, 473 U.S. at 194–95.  After all, "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."  *Id.* at 194.  When a state does provide "an adequate process for obtaining compensation," but a landowner has yet to avail himself of that process, then he has not yet been denied compensation.  *Id.*  More simply, he has not yet suffered an injury, because he never gave the state the chance to injure him.  Thus, his claim is unripe.

The process that Kentucky has chosen to provide for its landowners runs through the state courts.  The Kentucky Constitution requires that local governments pay for whatever property they take.  Ky. Const. § 242.  To enforce that provision, Kentucky law provides a cause of action for inverse condemnation to any landowner whose property has been taken

15

against whichever local entity did the taking.  *See, e.g.*, *Commonwealth v. Stearns Coal & Lumber Co.*, 678 S.W.2d 378, 381 (Ky. 1984).  That process is adequate under *Williamson*. *See, e.g.*, *Hammond v. Baldwin*, 866 F.2d 172, 178–79 (6th Cir. 1989).

That said, a landowner does not satisfy *Williamson*'s second requirement simply by bringing a state cause of action.  He must bring that action in state court.  *See Montgomery*, 226 F.3d at 765.  As *Williamson* says, a landowner's federal takings claim is not ripe until his local government has injured him, and his local government has not injured him until it takes his property and denies him compensation.  473 U.S. at 194–95.  What one municipal hand might taketh, the other might giveth back.  A landowner therefore cannot come to federal court until he has gone to state court and been denied.

Here, Ackermann argues that the City injured it.  But the problem is that Ackermann never gave the City a chance to finish the job.  After the Planning Commission allegedly took its property, Ackermann went right past the local circuit court and came straight into federal court.  As a result, Ackermann stands before the Court missing one important thing: an injury. And just as a doctor wouldn't put plaster on a working arm, a court cannot heal what is not yet injured.  Because Ackermann has not yet sought compensation in state court, its federal takings claim is unripe.

One might argue, although Ackermann does not, that going to state court at this point would be more hassle than it's worth.  If the state court denies Ackermann's claim, the argument would go, then this Court will have managed only to waste the parties' time and Kentucky's judicial resources.  And the state court very well might deny Ackermann's claim. The Kentucky Supreme Court has denied an inverse-condemnation claim because the landowner failed to exhaust its right to appeal the administrative decision.  *DLX I*, 42 S.W.3d

16

at 627.  As discussed above, Ackermann seems to have a similar remedy on hand: an appeal under KRS § 100.347.  But Ackermann has failed to exhaust that remedy, and in fact no longer *can* exhaust it—the thirty-day window for bringing that appeal closed long ago.  *See* KRS § 100.347(2).  Sending Ackermann to state court might therefore seem like asking someone to punch a wall just to prove that it hurts.  If injury is a foregone conclusion, why not hear the case now?  Indeed, the Sixth Circuit has held that a landowner satisfies *Williamson*'s remedies requirement when it is clear that "any state-court action [the landowner] files will be dismissed for want of exhaustion."  *DLX II*, 381 F.3d at 511.

But this case is a different animal than *DLX II*.  There, unlike here, the landowner had already brought an inverse-condemnation claim all the way to the Kentucky Supreme Court, thereby fulfilling "*Williamson*['s] requirement of pursuing available inverse condemnation remedies in state court."  *Montgomery*, 226 F.3d at 765.  And here, unlike there, injury is far from a foregone conclusion.  Kentucky law has a well-established "futility" exception to the exhaustion rule.  When pursuing administrative remedies "would be an exercise in futility," the state court can hold "the exhaustion requirement inapplicable" to a given landowner.  *Harrison's Sanitarium, Inc. v. Commonwealth*, 417 S.W.2d 137, 139 (Ky. 1968).  By the time *DLX II* reached the Sixth Circuit, the Kentucky Supreme Court had already decided—over dissent—not to apply the futility exception, even though administrative remedies were functionally unavailable.  *See DLX I*, 42 S.W.3d at 627 (Wintersheimer, J., dissenting).  Thus, the Sixth Circuit could say with certainty that any further state-court action "will be dismissed for want of exhaustion."  *DLX II*, 381 F.3d at 511.

But this Court cannot say that now.  The Kentucky courts have not yet had a pass at Ackermann's inverse-condemnation claim.  They might decide that this case is one where the

exception applies, since appealing under KRS § 100.347 would be "an exercise in futility." *Harrison's Sanitarium*, 417 S.W.2d at 139.  Or they might not.  Either way, the state courts have not denied Ackermann compensation.  Nor is it clear that they would.  At the moment, therefore, Ackermann is uninjured, and its federal takings claim is unripe.  That claim must therefore be dismissed.

One thing can be said for sure, however:  Ackermann would rather vindicate its Fifth Amendment rights in federal court.  Although the Court will dismiss Ackermann's takings claim, it will dismiss that claim without prejudice.  "[A] plaintiff in state court for the sole purpose of ripening [its] claims under *Williamson*" is, obviously, "in state court involuntarily." *DLX II*, 381 F.3d at 522.  Thus, the plaintiff may reserve its federal takings claim for another day.  *Id.* at 524; *see also England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 421–22 (1964) (establishing this type of reservation).  Ackermann must go to state court first; but as long as it only asserts its state claim—and reserves its federal one—Ackermann can bring the federal one again here if the state court denies just compensation.

**D.  Ackermann's Inverse-Condemnation Claim Is Not Ripe for Review**

As a corollary to its federal claim, Ackermann brings an inverse-condemnation claim under § 242 of the Kentucky Constitution.  R. 1 ¶¶ 47–52.  This claim too is unripe.  Indeed, it is the very claim that Ackermann must bring—in *state* court—before its federal takings claim.  *See Bigelow v. Mich. Dep't of Nat. Res.*, 970 F.2d 154, 160 (6th Cir. 1992).  Just like the Fifth Amendment, the Kentucky Constitution allows takings, but does not allow takings to go uncompensated.  Thus, to determine whether the City violated the Kentucky Constitution, the Court must know whether the City took Ackermann's land without paying for it.  And the Court cannot know that "until the state courts have ruled on [Ackermann's] inverse

condemnation claim." *Id*. Ackermann's state and federal claims are therefore unripe for the same reason: Ackermann has not yet suffered a violation of either the state or federal constitutions until the state of Kentucky, through the courts, has denied it compensation.

For the federal-jurisdiction enthusiasts in the audience, this decision might raise some eyebrows. This Court is currently sitting in diversity. Courts sitting in diversity normally hear state-law claims. So, it would seem, the Court can hear this one. But under *Williamson*, a landowner cannot come to federal court until he exhausts the available state options for compensation. Some states might have an agency he can turn to. Those states might also let him bring an inverse-condemnation suit if the agency denies him. If this case had arisen from such a state, and if the agency had already denied compensation, then the Court might have a ripe claim in front of it. In that scenario, the injury—a taking sans compensation—would be complete by the time the inverse-condemnation claim reached federal court.

But Kentucky has gone another way. An inverse-condemnation claim is the closest thing a Kentucky landowner has to an administrative remedy. Technically, a federal court sitting in diversity can hear such a claim. For practical purposes, however, that claim quacks like an administrative procedure, and, for jurisdictional purposes, acts like one, too. The basic premise of *Williamson* is that, although the Fifth Amendment requires states to provide *some* remedy for a taking, states may choose for themselves how to dole those remedies out. *See Williamson*, 473 U.S. at 195 ("[T]he Constitution . . . [is] satisfied by a reasonable and adequate provision for obtaining compensation after the taking[.]"). The federal courts may not interfere in that process, whether it runs through the state's agencies or its courts. By dismissing Ackermann's inverse-condemnation claim, therefore, the Court is not taking away

Ackermann's chance to litigate that claim.  Rather, the Court is following the procedures that Kentucky has chosen for itself, as *Williamson* requires the Court to do.

As a result, a federal court might never get to decide an inverse-condemnation claim under the Kentucky Constitution.  The claim will not ripen until the state court reaches a decision, which will then be subject to res judicata.  But that is a side-effect of interpreting *Williamson* to require "pursuing available inverse condemnation remedies in state court." *Montgomery*, 226 F.3d at 765.  Whether that side-effect is unintended, it seems to have gone unnoticed.  Fortunately, at least this side-effect has no chance to fester—if the state court denies just compensation, a plaintiff can always find a cure in federal court through a federal takings claim.  But for the time being, this Court must follow the law of the Sixth Circuit.  And that law says that Ackermann must bring its inverse-condemnation claim in state court.

### E.  The Tale of Many Breaches

The City, the Agency, and Ackermann all agreed to develop the Harbor Greene property.  But the property is still incomplete.  Why?  Well, the City and Ackermann tell different stories.  Each points the finger at the other, saying, in effect, "you breached first!"  So before the Court is a number of potential breaches, with one allegedly causing the others.

Under Kentucky law, one party's material breach of a contract may excuse the other party's performance.  *O'Bryan v. Mengel Co.*, 6 S.W.2d 249, 251 (Ky. 1928).  The theory is that the breaches work like dominoes:  Because the first material breach causes all the others, the others are excused.  Thus, the Court cannot grant summary judgment if there are genuine issues of material fact about whether—and when—the first alleged breach happened.

i. **No party is entitled to summary judgment on whether the City breached by withholding consent.**

Ackermann says that the City—and its subsidiary, the Planning Commission—breached § 4(a) of the Development Agreement by "unreasonably withh[o]ld[ing]" consent to its proposed changes to the Site Plan.  R. 76 at 28–32; R. 1 ¶¶ 41–46.  As discussed above, Ackermann cannot hold the City or the Agency liable for this alleged breach.  The City has sovereign immunity, and Ackermann has not sufficiently shown how the Agency breached the agreement.  Although Ackermann cannot hold the City *liable* for its alleged breach, the question whether it *did* breach is still relevant because Ackermann uses that alleged breach as a defense against the City's claims.  R. 76 at 39.

The City argues that Ackermann breached the agreements in several ways.  Some of them, Ackermann does not dispute.  But Ackermann says that those breaches are excused: Ackermann did not fully perform because the City materially breached first, making it impossible for Ackermann to perform at all.  *Id.* at 33, 37.  To decide whether the City is entitled to summary judgment on Ackermann's breach, the Court would need to know, first, whether the City actually breached first, and, second, whether that breach was "material." *O'Bryan*, 6 S.W.2d at 251.

Those questions must go the jury, because both Ackermann and the City have testimony backing up their respective theories.  Ackermann says that the housing-market crash left it with only one economically viable way to complete the Harbor Greene project—by building apartments.  But the City rejected Ackermann's requests to change the plan, which Ackermann says was unreasonable—and the City had agreed not to be unreasonable.  *See* R. 95 at 15–16; R. 83 at 16.  Ackermann supports this argument with expert testimony that building apartments

21

was indeed the only way that Ackermann could have finished the project. For example, George Chapman testified that after the crash Ackermann would have been unable to get a loan to build condos. R. 75 at 103 (Deposition of George Chapman). Even if it had, Chapman said, Ackermann would have gone bankrupt as a result. *Id*. at 155–56. Chapman further testified that building apartments would have been not only feasible, but more profitable for both Ackermann and the City. *Id.* at 104–05. Accepting those claims as true, it would indeed seem unreasonable for the City to force Ackermann to build condos that would not sell when apartments would have been better for everyone.

The City responds that its actions were in fact reasonable. Among other things, the City cites the findings that the Planning Commission made when it denied Ackermann's applications. Considering the concerns with traffic, density, and zoning violations that the Planning Commission raised, the City says that it was reasonable to withhold consent. R. 69 at 20–21; R. 1-10 (Planning Commission Minutes on January 5, 2012). And accepting those concerns as valid, it would seem reasonable to force Ackermann to follow the original plan.

Ackermann responds in turn that most of those reasons were not actually "reasonable" to consider. R. 76 at 26–30. Indeed, Ackermann has produced expert testimony suggesting that, in the context of zoning decisions, the only things that would have been "reasonable" for the City to consider were the new proposals' compliance with the zoning regulations and with the City's original—and very broad—Urban Renewal Plan. *See* R. 82 at 26 (Deposition of Jonathan Wocher); R. 73 at 106 (Deposition of Cynthia Minter); *see also* R. 1-2 (Urban Renewal Plan). Thus, if one of Ackermann's applications complied with both the zoning regulations and the original plan, the only reasonable decision the City could have made— Ackermann says—was to approve the application. R. 83 at 17–18. And Ackermann presents

evidence that City Staff, in an internal recommendation to the Planning Commission, confirmed the First Application's compliance. *Id.*; R. 72 at 162–64 (Deposition of John Yung, Reading from Exhibit 45).

The parties have produced evidence pointing in opposite directions, not only as to whether the City's actions were "reasonable," but also as to what definition of "reasonableness" should govern. At this stage, the Court cannot weigh the reliability of the various testimony and evidence. *See Anderson,* 477 U.S. at 249. Thus, the jury must decide whether the City unreasonably withheld consent, thereby breaching the contract.

### ii. No party is entitled to summary judgment on whether Ackermann breached by leaving the Harbor Greene Project incomplete.

The City first argues that Ackermann breached the Development Agreement because there are still undeveloped portions of land. R. 93-1 at 23. But the parties dispute a material fact underlying this issue: whether the Development Agreement required Ackermann to complete the project within a certain time period. If so—and if that time has passed—Ackermann breached. If not, Ackermann did not necessarily breach on these grounds.

To support its motion, the City argues that the Site Plan required Ackermann to complete the project in 2007. *Id.*; R. 85 at 2–3, 11. But that fact is disputed. For example, one of the City's employees acknowledged that the 2007 date was never "set in stone." R. 74 at 159 (Deposition of Keith Spoelker). Further, Ackermann's witnesses testified that the parties understood the Site Plan date as merely aspirational. According to Ackermann, the agreement only required Ackermann to commence development "[a]s soon as practicable after closing." R. 95 at 4 (citing 1-3 § 4(a) (Development Agreement)). And development has indeed commenced. Thus, there is a genuine issue as to how the parties viewed the Site Plan

23

alongside the Development Agreement, and whether the parties intended the 2007 date to be a hard deadline.

Further, Ackermann alleges that the City itself has prolonged and even endorsed the delay. First, the City has yet to grant the necessary permits for continued development. R. 95 at 5 (citing R. 70 at 128 (Deposition of Dobbs Ackermann)). Second, the City has been actively collaborating with Ackermann—despite the alleged delay—in such a way that waives the City's right to object to any delay. R. 90 at 5; R. 70 at 84 (Deposition of Dobbs Ackermann); *see also* 23 Williston on Contracts § 63:9 (4th ed.) (explaining that, under certain circumstances, a breach can be excused if the non-breaching party continues performing). This issue—whether the City effectively waived any objection to Ackermann's delayed performance—is, too, one for the jury.

Ackermann also presents two defenses to this breach, if indeed it is a breach. First, Ackermann argues that its alleged breach is excused because the City breached first. R. 76 at 39. As discussed above, there is a genuine issue of material fact as to whether the City materially breached. Thus, the Court must deny both parties' motions for summary judgment regarding whether Ackermann breached by failing to complete the project.

Second, Ackermann argues that completion of the project was made "impracticable" by the 2008 economic recession. R. 76 at 7–8; R. 95 at 16–18. To support this argument, Ackermann relies on the Second Restatement of Contracts. R. 95 at 16; *see also* Restatement (Second) of Contracts § 261 (1981). Ackermann appears to think that Kentucky adopts the Second Restatement approach to impracticability. But that proposition is not as simple as Ackermann makes it seem. For one thing, Ackermann cites only unpublished cases adopting that approach. And the Kentucky Supreme Court does not appear to have done so yet. True,

24

this Court may consider unpublished cases and speculate as to how the Kentucky Supreme Court would rule on an open question. *Managed Health Care Assocs. v. Kethan*, 209 F.3d 923, 927–29 (6th Cir. 2000). But the Court need not dive into the brambles of that process now, because there is a clear issue of material fact as to whether Ackermann breached, and, if so, whether that breach was excused. If Ackermann wants to develop its impracticability defense further, it must do so at trial.

### iii. No party is entitled to summary judgment on whether Ackermann breached by failing to make eminent domain payments.

Next, the City argues that Ackermann breached the Development Agreement when it failed to reimburse the City for the cost of acquiring eminent domain property—specifically, the "Matthews property." R. 93-1 at 25. Under the Development Agreement, if the City acquired a property through eminent domain, Ackermann agreed to "fund the costs and expenses." R. 1-3 § 5(a).

Ackermann admits that it has not paid. R. 95 at 14; R. 74 at 158–160 (Deposition of Dobbs Ackermann). But it responds that it does not have to do so yet because the City refuses to transfer the property. R. 95 at 14. As grounds, Ackermann points to § 5(c) of the Development Agreement, which says that "the title to the [eminent domain] properties would be . . . transferred to Ackermann at Closing." So, in Ackermann's view, the City should have given it the property first, and then Ackermann will pay.

But under the agreement, Ackermann must go first—specifically, by paying for the costs for the proceedings to acquire the property. Those costs, of course, accrue before the City even owns, and is therefore able to transfer, the property. *See* R. 1-3 § 5(a) (Development Agreement) (noting that when the City "authorizes . . . [eminent domain] [p]rocceedings . . .

Ackermann shall fund the costs and expenses"). And nothing in § 5(a), which establishes Ackermann's duty to pay for the proceedings, implies that those payments are contingent on § 5(c), which establishes the City's duty to transfer the property. So Ackermann has to pay, even if the City is dragging its feet on conveying the property. Ackermann would therefore seem to be in breach for not paying.

However, Ackermann alleges that this breach is excused for the reasons cited above: The City breached first, making it infeasible for Ackermann to pay for and to take the property, R. 76 at 39, and the 2008 economic recession made it impossible for Ackermann to make the payment, R. 95 at 2–3, 14. As discussed above, there is a genuine issue of material fact at least as to the first defense. Thus, the Court must deny both parties' motions for summary judgment on whether Ackermann is liable for failing to reimburse the City for acquiring the Matthews property.

### iv.  No party is entitled to summary judgment on whether Ackermann breached by failing to make PILOT payments.

The City next moves for summary judgment because Ackermann stopped making the PILOT payments required under the Service Agreement. R. 93-1 at 23–24; *see* R. 1-5 § 3 (Service Agreement). Ackermann does not contest its obligation, or its failure, to those make payments—Dobbs Ackermann himself admits as much. R. 70 at 64 (Deposition of Dobbs Ackermann); *see also* R. 71 at 52–53 (Deposition of John Wendt). But Ackermann again argues that it has two valid excuses for its failure to pay. The Court has already determined that it need not address the first reason—impracticability—at this time.

The second reason—that the City's alleged breach excuses Ackermann's later breach— is a bit trickier for this claim. Ordinarily, a breaching party is only excused if the other party

materially breaches first—on the same contract.  *See O'Bryan*, 6 S.W.2d at 251.  But here, there are two agreements: the Service Agreement, which requires the PILOT payments, and the Development Agreement, which Ackermann alleges that the City breached.  Neither agreement explicitly incorporates the other, nor does either agreement say that the other is a necessary condition.  Yet both parties seem to assume that the two agreements are intertwined.  At the very least, the City never contests that fact.  And under Kentucky contract law, the Court has no reason to, either.  *See Veech v. Deposit Bank of Shelbyville*, 128 S.W.2d 907, 911–13 (Ky. 1939) (reasoning that a court may interpret two agreements as one if the parties so intended).

Thus, as discussed above, there remains a genuine issue as to whether the City's failure to consent to Ackermann's new plans is a material breach that excuses Ackermann's failure to make the PILOT payments.  *See O'Bryan*, 6 S.W.2d at 251.

### v.  The City is not entitled to summary judgment on its assignment claim.

Next, the City moves for summary judgment because Ackermann did not seek the City's permission before transferring ownership of the development to its subsidiary.  R. 93-1 at 24.  The Development Agreement required Ackermann to do so.  *See* R. 1-3 §§ 4(g), 19.

Ackermann does not contest that it made the assignment.  Rather, it says that the City did not properly plead this argument in its complaint.  R. 95 at 13 (citing Exhibit A-Complaint, *City of Bellevue, Kentucky v. Ackermann Enterprises, Inc. et al*, No. 2:15-cv-00081-ART, D.E. 1-3 (E.D. Ky. May 20, 2015)).  Under Kentucky law, a party alleging breach of contract must state in its pleadings what the alleged breach is.  *Fannin v. Commercial Credit Corp.*, 249 S.W.2d 826, 827 (Ky. 1952); *see also Moxley's Adm'rs v. Moxley*, 59 Ky. 309, 312 (1859).

The City did not plead an assignment claim in its complaint.  Nor is there any indication that the City attempted to constructively amend its complaint or to otherwise put Ackermann on notice that it was pursuing this claim.  Thus, that claim does not exist before the Court.  And needless to say, the Court cannot grant summary judgment on a claim that does not exist.  *See Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) ("The district court did not err in dismissing [the plaintiff's] complaint by failing to consider a cause of action that she had not yet alleged."); *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 789 (6th Cir. 2005) (affirming the district court's refusal to consider or grant summary judgment on claims "that were never plead").  The City's motion for summary judgment on the assignment claim is therefore denied.

### vi. Ackermann is not entitled to summary judgment on the City's claim for contract damages.

Ackermann also asserts another reason that it—and not the City—is entitled to summary judgment:  The City has offered no evidence of damages for any of its breach-of-contract claims.  R. 76 at 39–40.  A party alleging breach of contract must show damages to establish its prima facie case.  *See, e.g.*, *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009).  But that burden is relatively low.  The City need not specify a final amount of claimed damages.  It only needs to show that a reasonable juror could find that the City suffered *some* damages from Ackermann's alleged breaches.  *See Celotex*, 477 U.S. at 322.

Thus, to survive Ackermann's motion for summary judgment, the only question is whether—construing the evidence in the City's favor—the City has produced any evidence of damages.  *Id.* at 323.  And the City has met that burden.  For example, Dobbs Ackermann

admitted that he owes money for unpaid PILOT payments and that he has not paid for the cost to acquire the Matthews property.  R. 70 at 130, 158–160 (Deposition of Dobbs Ackermann).  And Keith Spoelker testified that the City loses out on potential taxes during the time that Ackermann has not completed the project.  R. 74 at 140, 168 (Deposition of Keith Spoelker).  The Court must therefore deny Ackermann's motion for summary judgment on the basis of damages.

### vii. No party is entitled to summary judgment on foreclosure.

Finally, the City has moved for summary judgment on its foreclosure claim.  R. 93-1 at 2; R. 95 at 10.  Ackermann contests that claim with its own motion for summary judgment.  R. 76 at 41.  But before the City may seek foreclosure, there must be a breach.  Since the question of breach is a question for trial, the question of foreclosure is, too.  Thus, the Court must deny both motions for summary judgment.

## III.  Conclusion

Accordingly, it is **ORDERED** as follows:

(1)     The City's motion for summary judgment, R. 69, is **GRANTED IN PART AND DENIED IN PART**.   The City's motion is **GRANTED** as to Ackermann's breach-of-contract claims against the City and the Agency, and as to Ackermann's Fifth Amendment due-process claim.  In all other respects, the City's motion is **DENIED**.

(2)     Ackermann's motion for summary judgment, R. 76, is **GRANTED IN PART AND DENIED IN PART**.  Ackermann's motion is **GRANTED** as to the City's claims against Harbor Greene Residential.  In all other respects, Ackermann's motion is **DENIED.**

29

(3)     The City's motion for summary judgment on its breach-of-contract claims,

R. 93, is **DENIED**.

(4)     Ackermann's Fifth Amendment takings and state inverse-condemnation claims

are **DISMISSED WITHOUT PREJUDICE.**

This the 24th day of August, 2016.

Signed By:

_**Amul R. Thapar**_

**United States District Judge**