UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

ACKERMANN ENTERPRISES, INC., )
et al., )
 )                    Civil No. 14-207-ART
          Plaintiffs, )
 )
v. )            **MEMORANDUM OPINION**
 )                **AND ORDER**
CITY OF BELLEVUE, KENTUCKY, et )
al., )
 )
          Defendants. )

*** *** *** ***

The City of Bellevue and Ackermann Enterprises agreed to work together to build a luxury riverfront property. But when the economy did not hold, neither did their agreement. So they came to court. Once here, both sides moved for summary judgment. The Court denied those motions in many respects. But in two rulings relevant here, the Court granted summary judgment for the City on Ackermann's breach-of-contract claims and dismissed Ackermann's inverse-condemnation claim without prejudice. Ackermann believes those decisions were made in error. The City disagrees.

I

Many years ago, the City of Bellevue, Kentucky, decided to develop some land along the banks of the Ohio River. R. 1-2 (Bellevue Urban Renewal Plan). For help, the City turned to private developers; among them, Ackermann Enterprises. Together, Ackermann and the City agreed to a Site Plan for a development known as "Harbor Greene." R. 69-6 (Site Plan). That plan, after some changes here and there, envisioned commercial and retail

spaces mixed with three condo buildings. R. 69-7 (2003 Site Plan Revision); R. 70 at 43 (Deposition of Dobbs Ackermann). After Ackermann built the commercial properties and the first condo building, it twice sought permission to forego the final two. In their place, Ackermann offered to build a sizable number of apartments. But, each time, the Bellevue Planning Commission said no.

At an impasse, the parties went to court. Ackermann and some of its subsidiaries sued the City and its Community Development Agency in this Court, alleging breach of contract, unlawful taking, and due-process violations. R. 1. In turn, the City sued Ackermann in state court, alleging breach of contract and seeking foreclosure on the parties' Development Agreement. *See City of Bellevue v. Ackermann Enters., Inc.*, No. 2:15-cv-00081-ART, D.E. 1 (E.D. Ky. May 20, 2015). Ackermann then removed this second case to federal court, *id.*, and the Court consolidated the two, R. 32. With all the claims finally gathered in this Court, the parties filed a slew of summary judgment motions, one from every corner of this case. *See* R. 69; R. 76; R. 93.

That is where this case stood until August 24, 2016. That day, the Court issued a memorandum opinion and order ruling on the parties' summary judgment motions. R. 102. The Court denied one and split its judgment on the others. *Id.* at 29–30. And, as relevant here, the Court granted one of the City's motions, R. 69, on two issues: that the City was immune to suit on Ackermann's breach-of-contract claims, and that Ackermann's inverse-condemnation claim was not ripe. R. 102 at 7–9, 18–20. Ackermann now moves the Court to reconsider these portions of its opinion, arguing that they were wrongly decided. In the alternative, Ackermann moves to certify the relevant questions of law for interlocutory appeal and to stay these proceedings pending that appeal. R. 118.

The Court promptly denied one aspect of Ackermann's motion: its argument, made for the first time, that the City expressly waived its immunity in the parties' contracts. R. 121 at 2–3, 7. But there was more to Ackermann's motion than the express-waiver claim, and much remained for the Court to (possibly) (re)consider. *See* R. 118. So, with the final pretrial conference and trial date drawing near, the Court ordered expedited briefing on the remaining issues. R. 121.

## II

### A

Suing a governmental body is not easy. It is rarely as simple as filing a complaint and serving the right official. Sometimes the aspiring litigant must give the entity advance notice that he is going to sue. Other times he must navigate his claim through administrative channels before heading to court. And when he finally gets there, he often arrives only to face his biggest challenge yet: an argument that the government is immune to his claims.

This case is no exception. Ackermann sued the City for breach of the parties' Development Agreement, R. 1 at 12, only for the City to move for summary judgment on the grounds of immunity, R. 69 at 20–22. As for the source of that immunity, the City points to Kentucky's Claims Against Local Government Act ("CALGA"), KRS §§ 65.200–65.2006. *See* R. 69 at 20–22. The argument goes something like this: Section 65.2003(3) of that Act provides that a local government, like a City, "shall not be liable for injuries or losses" resulting from the "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority." And among other things, this section shields local governments from liability for "fail[ing] or refus[ing] to issue" a "permit, license, certificate, approval, order or similar authorization" or "fail[ing] to adopt any ordinance, resolution, order, regulation or rule."

KRS § 65.2003(3)(a), (c).  Here, Ackermann charges that the City breached the Development Agreement when it "unreasonably withheld consent" to Ackermann's proposals to revise the site plan.  R. 76 at 26.  In the City's estimation, though, that is no more than a claim that the City (or really, its planning commission) should have exercised its discretionary zoning and permitting authority differently.  Exactly the type of claim, the City argues, from which it is immune under Section 65.2003(3).

At summary judgment, the Court agreed with the City for two reasons.  R. 102 at 7–9. First, "[t]he City's decision," the Court reasoned, "fits squarely within the language of the immunity statute:  It 'refus[ed] to issue . . . approval' of [Ackermann's] proposed changes [to the site plan].  KRS § 65.2003(3)(c)." *Id.* at 8.  Second, the City denied Ackermann's two applications only after it "held hearings" and "solicited public comment." *Id.*  In other words, the City's "entire process" in reviewing those applications was "conducted under its quasi-judicial, quasi-legislative authority." *Id.*  The Court therefore determined that the City was entitled to immunity under the statute. *Id.*

What the statute suggested, precedent seemed to confirm.  Kentucky courts, the Court noted, "have found cities immune in breach-of-contract suits, as long as the city has not expressly waived immunity." *Id.* at 9 (citing *Ammerman v. Bd. of Educ.*, 30 S.W.3d 793, 797 (Ky. 2000)).  And here, Ackermann never argued that the City waived its immunity.  R. 121 at 2–3.  Meanwhile, the case that Ackermann cited to support its argument, *Madden*, seemed not quite on point:  Yes, *Madden* rejected a city's argument that it was immune from a breach-of-contract claim under Section 65.2003.  But *Madden* appeared to do so because the plaintiff challenged a "'purely ministerial dut[y]'" (repairing drainage problems)—"not an exercise of quasi-legislative or quasi-judicial authority." *Id.* at 8–9 (quoting *Madden v. City*

*of Louisville*, No. 2003-CA-001162-MR, 2004 WL 1588279, at *5 (Ky. Ct. App. July 16, 2014)). Given that distinction, *Madden* did not sway the Court's opinion or prevent the Court from granting the City summary judgment on Ackermann's breach-of-contract claims. *Id.* at 9, 29.

Ackermann, of course, disagrees with that resolution and moves the Court to reconsider it. As grounds, Ackermann argues that CALGA was enacted to codify a particular common law rule: that municipalities are not "immune from liability for ordinary *torts*" except those committed "in the exercise of legislative or judicial or quasi-legislative or quasi-judicial functions." R. 118 at 5–6 (emphasis added) (quoting *Haney v. City of Lexington*, 386 S.W.2d 738, 742 (Ky. 1964)). According to Ackermann, that rule explains why the Act repeatedly states that it applies to "actions in tort," R. 118 at 7 (quoting KRS §§ 65.2001(1), 65.2006), but "never once references any claim sounding in contract." R. 138 at 3. Between those references and this omission, Ackermann believes the plain language of Section 65.2003(3) cannot support the immunity claim the City would hang on it. To Ackermann, the statute affords local governments with immunity for some tortious acts but nothing more. *Id.* at 3–5. Ackermann adds that the City has never identified any authority suggesting it might get at common law the immunity it cannot get by statute. R. 118 at 5–6; R. 138 at 5.

B

Whether cities are immune from breach-of-contract claims under Section 65.2003(3) is no simple question. Indeed, the City makes a plausible argument, and a pretty simple one at that. Section 65.2003(3) says that, "[n]otwithstanding § 65.2001, a local government shall not be liable for injuries or losses resulting from . . . *[a]ny* claim arising from the exercise of

. . . quasi-judicial . . . or quasi-legislative authority." KRS § 65.2003(3) (emphasis added). One could be forgiven for reading these words and thinking "any claim" might just mean, well, "any claim." The Court, after all, took that position in its original order. R. 102 at 8.

On second look, though, the Court is no longer persuaded that the statute immunizes the City. As Ackermann points out, the statute never so much as mentions contract actions. Yet the statute is hardly silent on the issue of when and to which cases it applies. In a section captioned "application and construction," the statute specifies that it applies to "[e]very *action in tort* against any local government." KRS § 65.2001(1) (emphasis added). The statute clarifies, too, that it displaces case law "concerning *actions in tort*" (but only to the extent "specifically provided"). *Id.* § 65.2001(2) (emphasis added). And in describing the "judgments [it] affect[s]," the statute says only that it "shall apply to all *actions in tort* in which money damages have not been adjudged as of July 15, 1988." *Id.* § 65.2006 (emphasis added). Meanwhile, the statute's definition section reinforces what common sense and plain meaning already suggest: that actions in contract are not actions in tort. *See* KRS § 65.200(1) (defining "action in tort" as "any claim for money damages based upon negligence, medical malpractice, intentional tort, nuisance, products liability and strict liability"). So while Section 65.2003 might in isolation seem to apply broadly, the rest of the statute clearly cabins that section to actions in tort and tort alone. *See Sutton v. Rose*, 5 S.W.2d 892, 892 (Ky. 1928) (explaining that a court must read a statute "as a whole" and construe its parts to "reconcile apparent inconsistencies"); Antonin Scalia & Bryan A. Garner, Reading Law 167 (2012) ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many

parts.").

Neither is the Court alone in this impression. Viewing Section 65.2003 anew and in the right light, the Court now recognizes that it failed to give Ackermann's citation to *Madden* the credit it was due. The Court's prior order described *Madden* as rejecting a municipality's immunity defense to a contract claim because the actions at issue were ministerial and therefore outside the scope of Section 65.2003(3). R. 102 at 8–9. And so, in the Court's view, *Madden* did not resolve whether the defense would have prevailed if the actions had instead been quasi-legislative or quasi-judicial. *Id.* at 9. That was not quite right.

In *Madden*, the Kentucky Court of Appeals did cite the "ministerial duty" exception as grounds for denying immunity, but only as to the plaintiffs' *negligence* claims. *See Madden*, 2004 WL 1588279, at *4–5. As for the plaintiffs' *contract* claims, the court was clear: "[T]he breach of contract claim is not a tort. As such, it is not within the scope of CALGA, and the local governmental immunity provisions under the act are inapplicable." *Id.* at *5. "Reading CALGA as a whole," the court explained, "immunity available under KRS 65.2003" applies only when "the cause of action [is] an action in tort." *Id.* at *4.

As it turns out, *Madden*'s interpretation is consistent with how other Kentucky cases have described and applied CALGA. *See, e.g.*, *Schwindel v. Meade Cty.*, 113 S.W.3d 159, 163–66 (Ky. 2003). When a government-appointed task force first proposed what would later become CALGA, the proposal was known as the "Municipal Tort Claims Act." Legislative Research Comm'n, Research Report 232, at 45–46, 162–68 (Jan. 1988). Why the need for such a statute? Well, for many years cities in Kentucky were immune from tort claims related to the exercise of governmental functions, but not proprietary ones. In 1964, though, things changed. The Kentucky Supreme Court grew tired of spying the line between

governmental and proprietary functions, and so the Court abandoned the distinction. No longer were municipalities immune from tort liability. That is, with one exception: Cities remained immune in the exercise of their legislative, judicial, quasi-legislative, and quasi-judicial powers. *Haney*, 386 S.W.2d at 742; *see also Gas Serv. Co. v. City of London*, 687 S.W.2d 144, 147–48 (Ky. 1985) (reaffirming *Haney*'s abolition of municipal tort immunity). Well and good, but for a problem: In immunity's absence came the prospect of expensive liability and no shortage of calls for the Kentucky legislature to step in. *See, e.g.*, *Gas Serv.*, 687 S.W.2d at 151 (Wintersheimer, J., concurring). The result? CALGA, a statute "limit[ing] the damages awardable against a local government for its non-immune *tortious* acts . . . and . . . the damages that a local government is required to pay on behalf of its employees." *Schwindel*, 113 S.W.3d at 165 (emphasis added); *see also* KRS §§ 65.2002, 65.2005; Matthew T. Lockaby & JoAnna Hortillosa, *Government Tort Liability*, 36 N. Ky. L. Rev. 377, 379–83 (2009).

To these many points, the City offers one main response. *See* R. 135 at 4–6. Section 65.2003, the City notes, grants immunity "[n]otwithstanding KRS 65.2001." So, according to the City, even though Section 65.2001 expressly limits the rest of CAGLA to tort actions, that limit does not extend to Section 65.2003. In the City's view, then, the scope of Section 65.2003 immunity must therefore be considered on its own terms. And unlike the other provisions of CALGA, the City explains, Section 65.2003 contains no express limitation to tort actions—it applies instead to "injuries or losses resulting from . . . *any* claim arising from the exercise" of legislative and judicial powers. *See id.* at 5–6.

A clever argument, but one more flawed than foolproof. The Court believes there is a more modest and more plausible account of Section 65.2003(3) to be had: The prefatory

8

"notwithstanding" merely signals that, whatever other arrangements the statute might make with respect to municipal tort liability, the statute does not change the preexisting rule that cities are not liable *in tort* for the "exercise of judicial, quasi-judicial, legislative or quasi-legislative authority."

First, the "notwithstanding" language does not unmoor Section 65.2003 from the rest of the statute. Other sections of the statute expressly cabin Section 65.2003's application and construction. For example, Section 65.200 defines terms for the entire statute—which, of course, includes Section 65.2003. And Section 65.2001 provides that the sections that follow it—again, including Section 65.2003—both apply to actions in tort and displace the common law of municipal tort liability only to the extent "specifically provided." *See also* KRS § 65.2006. Given that Section 65.2003's sister provisions each discuss "actions in tort," it would be odd to say that this one section—though governed by the same restrictions and placed smack-dab in the middle of the statute—speaks of something else. A more plausible reading is that, when Section 65.2003 addresses "claims disallowed," it is referencing those "claim[s] for money damages based upon negligence, medical malpractice, intentional tort, nuisance, products liability and strict liability" to which the statute expressly applies. KRS § 65.200(1).

Second, the Kentucky legislature twice stated that the provisions of CALGA, including Section 65.2003, apply to actions in tort. KRS §§ 65.2001, 65.2006. But nowhere did the legislature address any other cause of action. To accept the City's immunity defense, the Court would have to find significance in that silence. Of course, discerning meaning in statutory silence is a thing courts sometimes (rightfully) do. But the significance that can be attributed to a statute's silence on an issue is generally limited to a single point: that which

9

was omitted was not meant to be addressed. *See* Scalia & Garner, *supra*, at 57–58, 93–94. Where, as here, a statute is otherwise intelligible, courts must ascribe legislative intention and meaning to such an omission. *See Hayes v. Commonwealth*, 660 S.W.2d 5, 6 (Ky. 1983); *Raines v. Commonwealth*, 379 S.W.3d 152, 155 (Ky. Ct. App. 2012). In other words, if CALGA was written like a tort statute, talks like a tort statute, and indeed was created as a tort statute, the Court should not treat it as something else.

Third, the Kentucky legislature knew how to specify the types of actions to which CALGA would apply. After all, the legislature mentioned "actions in tort" repeatedly. So if Kentucky had wanted to include breach-of-contract claims within CALGA's grant of immunity, the legislature could have done as other states have done and said so expressly. *See, e.g.*, Miss. Code Ann. § 11-46-1; *see also Commonwealth v. Allen*, 980 S.W.2d 278, 280 (Ky. 1998) ("If the legislature had intended to create an exception to the mandatory reporting duty, it could have explicitly done so, following the example of other state statutes."). But the legislature chose not to, seemingly for an obvious reason: As the Kentucky Supreme Court has explained, Section 65.2003(3) codified *Haney*'s rule "almost verbatim," *Schwindel*, 113 S.W.3d at 166, a rule that arose in a tort case and that was all about municipal tort immunity, *see Haney*, 386 S.W.2d at 742.

Finally, CALGA itself makes clear that the statute does not displace the common law generally, *see* KRS § 65.2001(2), and Kentucky common law does not immunize cities from claims in contract. Yes, sovereign immunity in Kentucky extends to contract claims as much as torts. *See Calvert Invest., Inc. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 805 S.W.2d 133, 136 (Ky. 1991). But courts in the commonwealth have long maintained that cities, unlike counties or the commonwealth itself, are not entitled to sovereign immunity.

*See Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859-60 (Ky. 2015). And so they have rejected attempts by cities to invoke sovereign immunity as a defense to breach-of-contract claims. *See, e.g.*, *Metro Louisville / Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 14–15 (Ky. Ct. App. 2009). To say, then, that Section 65.2003 protects the City in this case is to say that CALGA confers on cities a substantial form of immunity that they did not enjoy at common law; a conclusion that flies in the face of the Kentucky legislature's attempt to limit strictly CALGA's displacement of the common law.

As a final defense, the City points to a handful of Kentucky cases it believes support the Court's original position. R. 135 at 6–9. Chief among them is *Greenway Enterprises, Inc. v. City of Frankfort*, 148 S.W.3d 298 (Ky. Ct. App. 2004), a case that shares some similarities with this one. There, a housing developer got preliminary approval to develop a residential complex. *See id.* at 299–300. Later, the developer got final approval, too, for the first four phases of the development. *Id.* at 300. But when the time came for the fifth and final phase, the City of Frankfort delayed approval because the city's sewer system was not ready to handle the new residential units. *Id.* The developer eventually sued Frankfort in contract and in tort to recover the costs of the delay. *Id.* Predictably, Frankfort responded by asserting immunity under Section 65.2003. *Id.*

By the City's account, what happened next is this: The *Greenway* court held that Section 65.2003(3)(c) provided Frankfort with immunity "from either contract or tort liability." *Id.* at 302. To the City's credit, there is language in *Greenway* that supports this account. In one sentence the opinion states that the section "does not subject the City to *any* liability, even if some ministerial aspects are involved in the decision." *Id.* And in the very next sentence, the opinion states that the lower court "was correct in dismissing the City of

Frankfort from either contract liability or tort liability." *Id.* Armed with this language and the knowledge that *Greenway*, unlike *Madden*, was published, the City stresses that the only published authority to address the question presented here today cuts in favor of immunity.

The problem for the City is that *Greenway* said more than just this. Backing up a bit, it appears that the court in *Greenway* actually disposed of the developer's contract claims before even addressing the issue of immunity. As the court explained, the developer could not sue Frankfort for breach of contract because there was no contract to breach. *See id.* at 299 ("We opine that the planning and zoning approval of a preliminary development plan does not create a contract obligating the city to a timetable for the extension of sewer lines to the development . . . ."); *id.* at 301 ("Only when the plat becomes final are the parties' rights and expectations fixed."). Given that conclusion, the court had no reason to address whether Frankfort was immune from actions in contract under CALGA, which explains why the opinion never expressly analyzes whether contract claims fall under Section 65.2003. In fact, *Greenway* never actually says that the statute immunizes Frankfort from suits in contract—the opinion says only that the lower court correctly dismissed the developer's contract and tort claims. This reference, then, might be nothing more than a summation of the results of two distinct lines of inquiry: first, whether there was a contract to breach, and second, whether Frankfort was immunized from tort claims under Section 65.2003.

Under these circumstances, *Greenway* does little to persuade the Court. *Greenway* is not an opinion from Kentucky's highest court. *Greenway* either does not address Section 65.2003's applicability to contract claims or does so only in dicta. And *Greenway* fails to raise, let alone resolve, the many problems that the Court has identified with applying Section 65.2003 outside the realm of torts. *See Ziebart Int'l Corp. v. CNA Ins. Cos.*, 78 F.3d

245, 250 (6th Cir. 1995) ("We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly . . . ."); *cf. Copper S.S. Co. v. Michigan*, 194 F.2d 465, 468 (6th Cir. 1952) (concluding that a state supreme court's "expression of opinion was not necessary for [its] ruling" and so was "not binding" on a federal court).

Neither do the City's remaining citations tilt the balance in its favor. The City quotes a case describing the purpose of CALGA. But that quote acknowledges that the statute addresses liability for "tortious" acts. R. 135 at 6 (quoting *Russell v. City of Owensboro*, No. 2012-CA-002006-MR, 2014, Ky. App. Unpub. LEXIS 275, at *7 (Ky. Ct. App. Apr. 11, 2014)). The City also cites a passage from *Bolden v. City of Covington*, 803 S.W.2d 577 (Ky. 1991), discussing *Haney*'s rule. R. 135 at 6. But that passage, too, explains that *Haney* abolished municipal "immunity from ordinary *torts*." *Id.* (emphasis added) (quoting *Bolden*, 803 S.W.2d at 580). Consider also that, as both this Court and the Kentucky Supreme Court have explained, Section 65.2003 was intended to codify *Haney*'s rule. Suddenly these cases do no more than reinforce the Court's opinion that Section 65.2003 does not immunize municipalities from contract claims.

Sometimes, having to balance competing indications of a statute's meaning is a complicated task. Maybe at times it is no easier than "compar[ing] the weight of a stone to the length of a line." *De Niz Robles v. Lynch*, 803 F.3d 1165, 1175 (10th Cir. 2015). "But when the various factors [the Court] is charged with examining all point in the same direction—when the stone is very heavy and the line is very short—then at least [the Court] can be relatively sure of the right answer." *Id.* at 1176. Though it took further thought and reconsideration to reach this point, the Court now believes that this is one of those cases.

The plain language of Section 65.2003 does not grant the City immunity from breach-of-contract claims. The Court will therefore grant Ackermann's motion for reconsideration of this issue.

C

Immunity was not, however, the only argument that the City advanced in search of summary judgment on Ackermann's breach-of-contract claims. The City advanced two other theories as well. *See* R. 69 at 14-20. First, the City argued that it is not a proper party to this case because the actions of which Ackermann complains were taken by the City's planning commission, a distinct entity capable of being sued in its own name. *See id.* 14–16. Second, the City argued that, even assuming it is a proper party, Ackermann cannot show that the City unreasonably withheld consent from the proposed amendments. *See id.* at 17–20. Given the City's alternative theories, a question naturally arises: Might they still justify granting the City summary judgment, even if immunity no longer can?

The answer is no. The Court's August 24 Order already rejected the City's argument that it is not a proper party to this action. R. 102 at 6–7. Though the City's response to Ackermann's motion to reconsider asks the Court to revisit that conclusion, R. 135 at 11–13, the City advances substantially the same arguments as before. *Compare id.*, *with* R. 69 at 14–16. Seeing no clear error in the Court's prior disposition of this issue, the Court will not revisit it now based merely on the City's disagreement. *See Zink v. Gen. Elec. Cap. Assur. Co.*, 73 F. App'x 858, 861 (6th Cir. 2003). As for the argument that Ackermann cannot, as a matter of law, establish that the City unreasonably withheld consent, there are two hurdles instead of one. First, the Court's prior order rejected this argument as well. *See* R. 102 at 21–23. Second, the City has not argued that this disposition should be revisited. Seemingly

for good reason: As the Court already explained, summary judgment is not appropriate as to this issue because "[t]he parties have produced evidence pointing in opposite directions, not only as to whether the City's actions were 'reasonable,' but also as to what definition of 'reasonableness' should govern." *Id.* at 23. Since neither of the City's alternative theories can fill the role that immunity played in the August 24 Order, the Court will now deny the City's motion for summary judgment, R. 69, as to Ackermann's breach-of-contract claims.

IV

Ackermann also asks the Court to reconsider its inverse-condemnation claim. R. 118 at 15–17. Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction that Congress gives them. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). That includes diversity jurisdiction, which Ackermann properly asserts. Thus, Ackermann argues, this Court can and must hear Ackermann's state-law claim.

On closer inspection, however, that claim is booby-trapped. If the Court fulfills one obligation, it will fail another: its obligation to avoid interfering with state policy. In a word, comity. *See La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 33 (1959). In takings cases, comity means letting the state decide how to compensate its landowners. At least that is the upshot of *Williamson*, which says that a landowner must first pursue available state remedies before asserting a federal takings claim. *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195–96 (1985).

But *Williamson* does not say how a court should balance its competing obligations to both exercise jurisdiction and practice comity. More to the point, it does not say whether a court, sitting in diversity, can hear a state-law inverse-condemnation claim that a landowner has not yet brought to state court. Since *Williamson* was not a diversity case, the *Williamson*

Court did not have to say one way or the other. But since that court said nothing, this Court is left to face the hidden perils of Ackermann's claim, for the most part, alone.

But not without a little help from the parties. In its previous order, the Court pointed out some parts of the "*Williamson* trap,"[1] and both sides have since briefed the issue further. *See* R. 121 (order); R. 135 (the City's response); R. 138 (Ackermann's reply). The new briefs, however, change nothing: Ackermann's claim is unripe for federal review. A landowner cannot bring a state-law inverse-condemnation claim in federal court before bringing it in state court, even if the federal court is sitting in diversity. There are four reasons why.

A

First, the *Williamson* ripeness rule applies regardless of the type of federal jurisdiction a plaintiff asserts. Before *Williamson*, landowners were free to bring their takings claims to federal court before pursuing state remedies.[2] *Williamson* stopped them at the door—but not by limiting federal jurisdiction, *i.e.*, whether a court can hear a claim. Rather, *Williamson* put up a barrier to the types of claims that a plaintiff can bring at all. Two barriers, actually: If a landowner "has not yet obtained a final decision" from his local zoning board about how he can use his land, and not yet "utilized the procedures [the state] provides for obtaining just compensation," then his claim for compensation "is not ripe." *Williamson*, 473 U.S. at 186.

Ripeness is what those in the lawyering business call a "prudential" requirement. *See Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734 (1997). The "basic rationale"

---

[1] *See* Madeline J. Meacham, *The* Williamson *Trap*, 32 Urb. Law. 239 (2000).

[2] *See, e.g.*, Joshua D. Hawley, *The Beginning of the End? Horne v. Department of Agriculture and the Future of Williamson County*, 2012–2013 Cato Sup. Ct. Rev. 245, 246 ("[I]n no case before *Williamson County* did any federal or state court ever suggest that it lacked jurisdiction to hear a takings claim, or that the claim was somehow premature, merely because the claimant had not yet attempted to obtain compensation from the government.").

for the requirement is to prevent the federal courts from "entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). Federal courts like their disagreements concrete. To make a disagreement with a local government concrete, a landowner must climb the *Williamson* steps and may not leap a step simply by asserting diversity jurisdiction. Though *Williamson* was a federal-question case, it did not create a jurisdictional rule. It created a prudential requirement. That requirement comes from the Constitution. *See* U.S. Const. art. III; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43 n.18 (1993) ("[The] ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."). By contrast, diversity jurisdiction comes from a statute. *See* 28 U.S.C. § 1332. But, even when following a statute, the Court must still follow the Constitution. And the Constitution, as interpreted by the Supreme Court, says that a landowner may not come to federal court unless he pursues the available state remedies first. *Williamson*, 473 U.S. at 186.

Nor can a landowner leap over *Williamson* by asserting a state-law takings claim instead of a Fifth Amendment takings claim. Though *Williamson* was a Fifth Amendment case, its ripeness requirement is not limited to federal claims. Rather, the Court said that "[i]f the [state] government has provided an adequate process for obtaining compensation," then a landowner "'has *no claim* against the [g]overnment' for a taking." 473 U.S. at 194–95 (emphasis added) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 n.21 (1984)). Simply put, if a landowner contends that the state has taken his land without compensation, but has not yet sought compensation from the state, he may not seek it in federal court.

To be sure, applying *Williamson* to this case is not as easy as it might look. Although *Williamson* says that a landowner must bring a state takings claim before a federal takings

claim, it does not say *where* he has to bring that claim. Why not federal court? After all, maybe a state wants to delegate its land disputes to the federal courts. (Pity the state that does, though.) And that is just one of *Williamson*'s problems. Another is that, after litigating his state takings claim, a landowner could find himself precluded from litigating his federal claim later. *See San Remo Hotel, L.P. v. City & Cty. of S.F.*, 545 U.S. 323, 337–38 (2005); *see also* Frederic Bloom & Christopher Serkin, *Suing Courts*, 79 U. Chi. L. Rev. 553, 605 (2012) ("State courts thus get [the] first bite at these actions under *Williamson* . . . and they get the only bite under *San Remo*."). Justices Thomas and Kennedy were certainly onto something this term when they called on the Supreme Court to revisit the "quagmire" that *Williamson* has left behind. *See Arrigoni Enters., LLC v. Town of Durham*, 136 S. Ct. 1409, 1412 (2016) (Thomas & Kennedy, JJ., dissenting from denial of certiorari). Indeed, this case demonstrates just what a "quagmire" the law in this area has become. And the present dispute does not even touch on the Justices' larger point that courts are misconstruing the doctrine altogether. *See id.* at 1409-10 (pointing out that compensation "must accompany the taking" and that the Constitution places the burden on the government to provide compensation, not just on the landowner to seek it). But for now the law is *Williamson*, which this under-court must follow. The best reading of *Williamson* is that landowners must follow the state compensation process, even if that process runs through the state courts. Although federal courts sitting in diversity can hear state-law claims, federal judges do not make good local administrators. Thus, when the state-law claim has to do with a local land dispute—and the state has a process for dealing with that dispute—*Williamson* tells federal judges not to hear the claim.

Here, Kentucky has a process for dealing with Ackermann's claim. Indeed, it is the same process that was available to the plaintiff in *Williamson*: a cause of action for inverse condemnation. *Id.* at 196. And as this Court reads *Williamson*, landowners must pursue that claim through the state process—including its judicial process—first. Ackermann has not. Thus, its inverse-condemnation claim is not ripe for federal-court review.

B

Second, when it comes to *Williamson* ripeness, a state-law inverse-condemnation claim is an administrative remedy. And a landowner must bring that claim to the appropriate "agency," which, in this case, is the state court. Granted, the idea seems counterintuitive— the state court is an agency? Really? But it has a solid basis in law.

First of all, it is clear that the *Williamson* rule applies even in states like Kentucky, which provide inverse-condemnation claims in lieu of more normal-looking administrative remedies. As noted above, *Williamson* itself dealt with such a state. Following *Williamson*, the Supreme Court and the circuits have consistently held that inverse-condemnation claims are just the type of "adequate provision for obtaining compensation" that a landowner must try out before coming to federal court. *See Williamson*, 473 U.S. at 194–95; *see also First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 312 n.6 (1987) (concluding that a landowner satisfied *Williamson* by bringing an inverse-condemnation claim in state court); *Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 16 (1st Cir. 2007) (stating that "[m]ost commonly in regulatory takings cases" the remedy is "a state inverse condemnation proceeding," and collecting cases). And the Sixth Circuit has recognized, *Williamson* does not "mandate" that the states provide a particular procedure. *Kruse v. Village of Chagrin*

19

*Falls*, 74 F.3d 694, 698 n.2 (6th Cir. 1996). An inverse-condemnation cause of action works just fine. *See, e.g.*, *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994).

Ackermann would respond: Fine, but that does not answer the question at hand. Again, the question is why should a landowner have to bring an inverse-condemnation claim "in state court" first, rather than to a federal court sitting in diversity? *Montgomery v. Carter Cty.*, 226 F.3d 758, 765 (6th Cir. 2000). And that question, the cases do not seem to answer.

But that's not to say there is no answer. This Court can think of at least one: When a state court decides an inverse-condemnation claim, it is not acting entirely like a court; it is acting like a quasi-agency. The court is, after all, standing in for the land-use agency that the state would otherwise have in place, and that other states have put in place. States have used courts instead of agencies for all sorts of tasks—to review tax assessments, *see Upshur Cty. v. Rich*, 135 U.S. 467 (1890); to determine riparian (*i.e.*, river-land) rights, *see Pacific Live Stock Co. v. Lewis*, 241 U.S. 440 (1916); not to mention all the more everyday tasks that states assign to their judges, like resolving disputes over traffic tickets and child custody.[3] In those cases, the courts "determine questions of quantity, proportion, and value." *Upshur*, 135 U.S. at 478. And that job does not take "judicial powers" to do. *Id.* Thus, though shaped like courts, those courts act like agencies.

Thinking about the state courts as agencies could clean up the *Williamson* quagmire. To calculate compensation for a taking, the court must determine the "quantity" of the land, the "proportion" that was taken, and the "value" of that portion. *Id.* In other words, it must

---

[3] *See Removal to Federal Courts from State Administrative Agencies*, 69 Yale L.J. 615, 615–17 & nn.8–15 (1960) (collecting examples). In one case, *Searl v. School Dist. No. 2*, 124 U.S. 197 (1888), the Supreme Court held that an eminent-domain proceeding was a justiciable controversy, and therefore was removable to federal court. That case, however, was decided almost one-hundred years before *Williamson*.

act like an agency. And a federal court can review whether an agency has violated the Constitution—in this case, by failing to provide just compensation. Indeed, that is the crux of a federal takings claim. The *Williamson* Court put it best: After following the designated state procedures, a landowner can come to court arguing that those procedures "fail[ed] to provide [him] adequate compensation" and thus violated the Fifth Amendment. *Williamson*, 473 U.S. at 195. By analogy, when a prisoner believes a guard has unlawfully taken his property, he must complain to the prison—but if the prison fails to afford him due process, he may complain to a court. *See id.* (discussing *Parratt v. Taylor*, 451 U.S. 527 (1981)).

Thus, although many scholars and at least two Justices worry that *Williamson* shuts the doors of federal court to landowners, there might still be a key under the mat. As discussed above, the Supreme Court has long treated courts like agencies when they carry out administrative functions. Applying the same logic to inverse-condemnation claims would permit landowners to come to federal court even after going through state courts first. If state courts act like agencies when they process inverse-condemnation claims, then their decisions would not be entitled to preclusive effect. By analogizing landowners to prisoners, the *Williamson* Court apparently contemplated this process. And even if it did not, implementing the process would help make sense of *Williamson* and preserve federal rights.

Of course, the present case is a little different than the hoary old cases cited above, in part because local governments have gotten better at taking land. Rather than razing a house or running a road through the backyard, governments commonly take property through regulation. And it does require some judicial powers to determine whether, as a legal matter, a regulation causes a taking. So when parties allege regulatory takings, as Ackermann does, it is less clear how much their claim asks the state court to act like a court, and how much the

state court must act like an agency.  Determining the value of land—an agency can do that.  But determining whether a taking has happened at all—that usually takes a court.

But that problem is beside the point.  The point of *Williamson* is that states should get to choose how to compensate their landowners.  To enforce that point, *Williamson* requires landowners to follow whatever procedures their states choose.  Some states use bureaucrats.  Some states use judges.  *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 715 (2010) (recognizing that states can take private property with their courts).  Either way, *Williamson* ensures that someone from the state—not someone from the federal judiciary—will be the one determining the value of local land and calculating compensation.  To hear Ackermann's inverse-condemnation claim would, effectively, be to participate in the local administration of the City of Bellevue.  Whatever *Williamson*'s flaws, at least it protects the states from having federal judges for bureaucrats.

Thus, although a state-law inverse-condemnation claim is a judicial remedy in name, it is an administrative remedy in fact.  When state courts hear such claims, they carry out a function that, had their respective states opted for a more complex administrative apparatus, an agency would be performing instead.  Ackermann's inverse-condemnation claim therefore must first go through the state's quasi-agencies: its courts.

C

Third, creating a diversity-jurisdiction exception would undermine the *Williamson* rule and the foundation for that rule—comity.  Such an exception would allow a landowner to use federal court to ripen a federal takings claim.  The trick would be simple:  Just bring a state-law inverse-condemnation claim to federal court and assert diversity jurisdiction, then, if that claim fails, come back with a Fifth Amendment claim.  For some litigants, therefore,

the diversity exception would replace the *Williamson* steps with an escalator, and cut the state out of the process completely.

Nevertheless, some other circuits have permitted a diversity exception to *Williamson*. *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 385–87 (5th Cir. 2001); *SK Fin. SA v. La Plata Cty., Bd. of Cty. Comm'rs*, 126 F.3d 1272, 1276 (10th Cir. 1997). When the Fifth Circuit did so, it addressed a variation of the escalator problem: "that to allow a district court to hear a state takings claim in diversity is to risk the danger of [that] court reviewing its own decision regarding the state claim to determine if *that* decision denied the plaintiff just compensation." *Vulcan*, 238 F.3d at 386. In other words, after a federal court ripens a landowner's federal takings claim by hearing his state claim, the federal court will then have to decide whether its own decision was unjust. But the Fifth Circuit "th[ought] that this would almost never be a problem," because the landowner would be collaterally estopped from re-litigating his state claims in federal clothing. *Id.*[4]

This Court must, respectfully, disagree. The Fifth Circuit found comfort in the view that, whether the landowner wins or loses on his state-law inverse-condemnation claim, estoppel principles will prevent him from bringing the same claim as a Fifth Amendment claim. Thus, the federal court will not have "ripened" the federal claim, because it will effectively have already decided that claim and could not decide it again. That is exactly the problem. The court could not decide the federal takings claim *because the court already decided it*. Thus, the court would have decided a claim before that claim became ripe—and,

---

[4] The Tenth Circuit apparently thought so, too. At least, that court never addressed the potential problems of a diversity exception when it created one. *See SK Fin. SA*, 126 F.3d at 1276.

worse yet, before the *state* courts ever got a chance to hear it.[5]  The escalator would be up and running:  Landowners could bring takings claims to federal court before pursuing any state remedies.  To survive protest, they would just need to call those claims something else, namely, inverse-condemnation claims.

Consider the possibilities if this Court were to hear Ackermann's state-law inverse-condemnation claim at this point:

(1)  *Ackermann wins*.  Then res judicata presumably will prevent either a state or federal court from reconsidering the federal jury's compensation award.  This Court thus will have decided the federal takings claim, under a different alias.

(2)  *Ackermann loses*.  Then Ackermann theoretically will bring a federal takings claim in this Court, arguing that it was denied just compensation for a taking.  This Court thus will have ripened the federal takings claim, and will find itself ordering a second federal jury to reconsider the findings of the first.  If such a process is even allowed, it certainly wastes resources.  And on further review, this Court might conclude that such a process is not allowed.  *See Freeman v. Chicago Park Dist.*, 189 F.3d 613, 618 (7th Cir. 1999) ("The Seventh Amendment prohibits a second jury from being given the opportunity to render a verdict inconsistent with a prior jury's verdict.").

---

[5] The Fifth Circuit seems to openly allow landowners to subvert the ripeness doctrine in this way.  In *Samaad v. City of Dallas*, 940 F.2d 925 (5th Cir. 1991), the court held that a landowner cannot ripen his federal takings claim by simultaneously asserting a state-law inverse-condemnation claim.  *Id.* at 934.  Thus, under *Samaad*, a court must dismiss the federal claim.  But, under *Vulcan*, the court may hear the state claim—and could not rehear the federal one later on.  By deciding the state claim, then, the court will have effectively decided an unripe federal claim.

(3)   *Ackermann loses, but the Court decides that it is collaterally estopped from relitigating compensation.*  Same problem as in (1) above:  The Court decided the federal takings claim before Ackermann was even allowed to bring it.

(4)   *Ackermann wins, but then brings a federal takings claim, arguing that its compensation was not "just."*  Same problem as in (2) above:  The Court has ripened the takings claim and now must have a second jury question the first.

Aside from their unique issues, these scenarios have one thing in common:  In each, the Court has undermined *Williamson*.  By hearing Ackermann's state-law claim, the Court would effectively decide Ackermann's federal claim—before Ackermann has pursued the available state remedies.  And from here on out, a landowner lucky enough to meet the rules for diversity jurisdiction would be exempt from state procedures.  To avoid creating that end-run around *Williamson*, this Court must refrain from hearing Ackermann's state-law inverse-condemnation claim.

## D

Finally, federal courts should stay out of complicated issues of state law.  That is especially true when the issue is about what the state should do with its land, which is "intimately involved" with the state's "sovereign prerogative."  *Thibodaux*, 360 U.S. at 28.

And the state-law issue here is complicated.  On the one hand, Ackerman might not have a compensation claim under Kentucky law.  The Kentucky Supreme Court has said that a state-law inverse-condemnation claim is unripe until a landowner exhausts the available administrative remedies, like the one set out in KRS § 100.347.  *See Commonwealth v. DLX, Inc.*, 42 S.W.3d 624, 625 (Ky. 2001).  That would be reason alone to find Ackermann's state-law claim unripe.

On the other hand, Kentucky has a futility exception, allowing plaintiffs to go to court when going through administrative hoops would be pointless. *See Harrison's Sanitarium, Inc. v. Commonwealth*, 417 S.W.2d 137, 139 (Ky. 1967). Since Ackermann has missed the deadline for bringing a claim under KRS § 100.347, bringing that claim would be futile. Given the apparent tension between the two doctrines, it is unclear whether a state court would hear Ackermann's inverse-condemnation claim—and, thus, whether this Court should.

The Court could, therefore, simply abstain. *See Thibodaux*, 360 U.S. at 30–31; *see also Caleb Stowe Assocs. v. Cty. of Albermale, Va.*, 724 F.2d 1079, 1080 (4th Cir. 1984) (using *Thibodaux* abstention in a land-use case). In this case, however, an abstention would work the same as a dismissal. If Ackermann ever comes back, the Court will have to honor the state court's decision on the inverse-condemnation claim. Plus, dismissal is appropriate when a federal court must wait for a state administrative procedure to play itself out. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 334 (1943). And as discussed above, a state-court inverse-condemnation proceeding functions as a quasi-administrative proceeding. As such, if Ackerman feels that the city/state has violated Ackerman's Fifth Amendment rights, he can bring a takings claim in federal court.

Thus, dismissal seems the way to go. During the state-court litigation, Ackermann can reserve its federal claims. *See England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 421–22 (1964).

## V

Accordingly, it is **ORDERED** as follows:

(1)   Ackermann's motion for reconsideration or, in the alternative, to certify the Court's Order of August 24, 2016, for interlocutory appeal, R. 118, is

**GRANTED IN PART** and **DENIED IN PART**. Ackermann's motion is **GRANTED** as to Ackermann's breach-of-contract claims against the City. Ackermann's motion is **DENIED** as to (1) Ackermann's inverse-condemnation and takings claims and (2) Ackermann's request to certify the Court's prior order, R. 102, for interlocutory appeal.

(2) The Court's Order of August 24, 2016, R. 102, is hereby modified and amended to **DENY IN PART** the City's motion for summary judgment, R. 69, insofar as it seeks summary judgment on Ackermann's breach-of-contract claims. The Court's prior order, R. 102, remains in effect in all other respects.

This 19th day of September, 2016.

Signed By:

*Amul R. Thapar*

United States District Judge